## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ERIE SAMPSON,

        *Plaintiff*,

   v.

DISTRICT OF COLUMBIA RETIREMENT
BOARD,

        *Defendant*.

Civil Action No. 24-2601 (TJK)

## <u>MEMORANDUM OPINION & ORDER</u>

The District of Columbia Retirement Board manages a pension fund worth over $10 billion. To help decide on investment strategy, including which investment firms to partner with, the Board uses an advisory firm. In 2020, Erie Sampson—the Board's general counsel—became concerned that the Board's investment advisor had leaked confidential information to another firm and had engaged in other potentially unlawful behavior. She alleges that neither the Board's trustees nor its executive director took these potential problems seriously. So a few months later, Sampson and another Board employee contacted the Securities and Exchange Commission to share information about possible legal violations related to the investment firm's conduct. The SEC engaged with Sampson, asking her to provide Board materials and more information about her concerns.

When the Board learned that Sampson had talked to the SEC, it placed her on administrative leave, investigated her conduct, and eventually fired her. Sampson brought this suit two years later, alleging that the Board unlawfully retaliated against her for protected whistleblowing activity. The Board moved to dismiss for three reasons: sovereign immunity shields its discretionary employment decision to fire Sampson, and in any event, because she fails to allege that she told

the SEC about violations of federal securities laws or that protected activity caused her firing. But none of these arguments persuades. Federal law restricts the Board's discretion by prohibiting it from retaliating against whistleblowers, so the claimed immunity—which requires a discretionary act—does not apply. And Sampson plausibly alleges both that she provided information relating to a violation of federal securities laws and that this protected activity caused the Board to fire her, so her retaliation claim clears the pleading stage. Thus, the Court will deny the Board's motion to dismiss.

## I.    Background

Operating as an independent agency within the D.C. government, the District of Columbia Retirement Board manages the $11 billion pension trust fund for two retirement funds: one for the District's firefighters and police officers, and one for its teachers. ECF No. 1 ("Compl.") ¶ 3. Comprised of 12 trustees, the Board "administers pension benefits for over 21,000 participants and beneficiaries." *Id.* And for over a decade, it has used Meketa Investment Group as its "general investment adviser." *Id.* ¶ 22. Meketa, as a "registered investment adviser" under federal law, works with clients to help them design and manage "private market portfolios." *Id.* ¶¶ 12, 14. In this role, Meketa also identifies "investment managers" aligned with each client's "investment objectives." *Id.* ¶ 13. It has done that for the Board by serving as the "sole investment adviser" to "recommend[], vet[], select[], and monitor[] investment managers." *Id.* ¶ 22.

Erie Sampson began working for the Board over 15 years ago. *See* Compl. ¶ 2. More recently, she served as the Board's "General Counsel and Ethics Counselor." *Id.* And that role led her to become familiar with the federal securities laws, in part by "work[ing] on over 75 investment transactions" for the Board. *Id.* ¶ 10. She also "attended specialized training sessions" and "seminars" about these laws. *See id.* ¶ 11.

In January 2020, Sampson met with the Board's executive director, who was also her "direct supervisor." Compl. ¶¶ 29–30.  The executive director allegedly showed Sampson a text message from the co-founder and CEO of Artemis Real Estate Partners, an investment manager who had invested funds for the Board.  *Id.* ¶¶ 24, 26, 28, 30–31.  The message relayed that the CEO "had been told" that someone within the Board's investment department was not "favorably disposed to a new proposed investment commitment" to Artemis for "millions of dollars."  *Id.* ¶ 31.  More than that, the CEO "quoted" language "from an internal" Board "staff/consultant investment meeting" about new "investments (including for Artemis)."  *Id.* ¶ 32.  But understandably, Artemis had no representative at that internal meeting; only two Meketa representatives, two "senior investment professionals from" the Board's investment department, and Kimberly Woods—the Board's "Director of Risk and Investment Compliance"—attended.  *Id.*

Sampson alleges that she immediately "expressed concern" about this message.  Compl. ¶ 34.  Not only did she tell the executive director that "someone from Meketa" might "have revealed internal confidential [Board] deliberations" to Artemis, but she also explained that revealing that confidential information "would be a violation of law."  *Id.* ¶¶ 34, 35.  The executive director said that she "would follow-up with" the Meketa representatives, "report her findings to the Board chair," and more generally "manage" the "text message" issue "and any Board communications."  *Id.* ¶ 36.  But about four months later, the Board "approved a commitment of up to $60 million to Artemis."  *Id.* ¶ 38.  The executive director had not checked in with Sampson about the text message despite saying that she would.  *Id.* ¶ 39.  And when Sampson followed up in July 2020, the executive director said that "she was taking care of the" matter and that "Sampson did not need to concern herself with it."  *Id.*

For this reason and others, Sampson and Woods were allegedly worried about whether Meketa was "compl[ying]" with its legal obligations—specifically, those under the Investment Advisers Act of 1940 and the Securities and Exchange Commission's "due diligence and fiduciary requirements." Compl. ¶ 40. So with "Sampson's input," Woods prepared a presentation for the Board's trustees titled "Investment Compliance Update." *Id.* Before delivering the presentation, though, Sampson and Woods discussed it with the executive director. *See id.* ¶ 41. She told them to monitor their expectations; "several of the Trustees," she purportedly "indicated," "would likely not be receptive." *Id.* That warning tracked what Sampson and Woods already "knew": "some of the Trustees were sensitive to any critical information about Meketa." *Id.*

With Sampson attending, Woods delivered the presentation in late July 2020. Compl. ¶¶ 40, 42. That presentation covered at least three specific concerns about Meketa: the firm "providing misleading information to the Trustees on [Board] investment matters," "inconsistently applying its due diligence processes," and improperly "manag[ing] conflicts of interests" when searching for "an investment manager." *Id.* ¶ 42. To flesh those out, Woods detailed two examples of concerning conduct. First, Meketa had "represented" to the Board's investment committee that it had gone "onsite and performed Operational Due Diligence on" an "investment manager." *Id.* ¶ 43. But a high-level executive of that investment manager later said that it "never specifically spoke with or met with anyone at Meketa." *Id.* Second, "Meketa had indirectly marketed specialized services" to the Board even though Meketa had been "retained to" help the Board "search" for "*another* external consultant to provide such specialized services." *Id.* ¶ 44 (emphasis added). And that setup allegedly created "a conflict of interest." *Id.* Finally, the presentation "advised" the Board's trustees about "several requirements that" federal law "impose[s] on registered investment advisers like Meketa"—among others, "implementing written policies" that "are reasonably

designed to prevent" violations of "federal securities laws," and "adopting a code of ethics reflect-
ing . . . fiduciary obligations." *Id.* ¶ 45. According to Sampson, the trustees gave a mixed response
at best. Some allegedly "showed little interest in Meketa's compliance issues and practices," "were
hostile to" Sampson and Woods for "rais[ing]" those issues, and "were more interested in renewing
Meketa's investment consulting contract." *Id.* ¶ 46. And the trustees did just that at the end of the
meeting. *See id.*

A few weeks after the presentation, Woods asked Sampson for permission to contact the
SEC. *See* Compl. ¶ 50. Sampson gave the green light. *Id.* By that time, Sampson and Woods
had witnessed the trustees' "apathetic and hostile reaction" to the compliance presentation. *Id.*
They had also sent Meketa a "Compliance Questionnaire" following the presentation, but the
firm's responses "raised more concerns about" its compliance with "investment adviser responsi-
bilities under" federal law. *Id.* ¶¶ 47–49. And Sampson had still heard nothing about the "Artemis
text message issue," so she believed that it "would not be resolved" by the Board and "that the
SEC would be better positioned to investigate any violations of the . . . federal securities laws and
regulations" that Meketa or Artemis had committed. *Id.* ¶ 50.

Sampson and Woods jointly called the SEC around September 2020. *See* Compl. ¶¶ 51–
52. They allegedly told "SEC Enforcement Division attorneys that they" possessed—and wanted
to share—"information relating to a possible violation of federal securities laws." *Id.* ¶ 53. After
an SEC attorney asked to speak with them separately, Sampson left the call while Woods shared
her "concerns" about Meketa. *Id.* ¶¶ 54–56. The SEC emailed Sampson about a week later asking
to speak. *See id.* ¶ 58. On that call, Sampson "provided information" about how "Meketa and/or
Artemis" had possibly violated "federal securities laws." *Id.* ¶ 59. She described the "text mes-
sage" from Artemis's CEO and "her belief that Meketa had" "leak[ed]" "proprietary and

confidential information about internal [Board] investment deliberations with" Artemis, which "was seeking [Board] approval to invest" significant "assets." *Id.* ¶ 60.  That concern about "Meketa not maintaining [Board] internal information confidentially," Sampson told the SEC, prompted her and Woods to send Meketa the compliance questionnaire and "get to the root of some of the compliance concerns." *Id.* ¶ 62.  More still, Sampson relayed that she and Woods had prepared the presentation about compliance concerns and presented it to the Board's trustees in late July.  *See id.*  Soon after this call, the SEC asked Sampson to provide a copy of that presentation.  *See id.* ¶ 63.  She agreed and uploaded the PowerPoint through a "secure online SEC portal link" that the Commission had provided.  *Id.* ¶¶ 65–67.  And responding to the SEC's follow-up "questions about" the presentation, Sampson and Woods shared more "information about Meketa"—specifically, how the firm provided "misleading information to the [t]rustees," "inconsistently appl[ied] its due diligence processes," and incapably "manag[ed] conflicts of interest." *Id.* ¶ 69.  The duo also gave more information about the two examples of potential misconduct described in the presentation.  *See id.* ¶ 70.

In late September 2021, Woods told the Board that she and Sampson had spoken with the SEC about potential violations of federal securities laws.  Compl. ¶ 71.  The Board sent Sampson a letter a week later telling her that it would "immediately" investigate whether she disclosed (or failed to disclose) "material information" about investments to the Board, and it placed her on administrative leave.  *Id.* ¶ 73.  Just over two months later, Sampson "confirmed" to a Board "investigator" that she had given the SEC "information relating to a possible violation of federal securities law by" the Board's "investment advisers." *Id.* ¶ 74.  And in July 2022, the Board fired her.  *See id.* ¶ 84.

Sampson sued two years later. *See generally* Compl. She brings one claim: whistleblower retaliation under the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6 *et seq. See* Compl. ¶¶ 94–102. The Board moves to dismiss on jurisdictional and non-jurisdictional grounds. *See* ECF No. 9.

## II.    Legal Standards

A plaintiff must establish the Court's subject-matter jurisdiction to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Because "sovereign immunity is a jurisdictional issue," *Hulley Enters. Ltd. v. Russian Fed'n*, No. 23-7174, 2025 WL 2216545, at *6 (D.C. Cir. Aug. 5, 2025), courts apply Rule 12(b)(1) to motions to dismiss invoking it, *see Black Lives Matter D.C. v. United States*, 775 F. Supp. 3d 241, 262–63 (D.D.C. 2025). The Court "assume[s] the truth of all material factual allegations in the complaint and 'construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged,' . . . and upon such facts determine[s] jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). Without subject-matter jurisdiction over a claim, the Court must dismiss it. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff states a facially plausible claim when he pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true "all well-pleaded factual allegations" and "construes reasonable inferences from those allegations in the plaintiff's favor." *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014). But "mere conclusory statements" are not enough to establish a plausible claim, and courts "are not bound to accept as true a legal conclusion

couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## III.    Analysis

The Board offers three reasons for dismissal.  It starts with jurisdiction, claiming that sovereign immunity bars Sampson from challenging its decision to terminate her—a decision that the Board describes as discretionary.  And even if Sampson clears that hurdle, the Board says that her anti-retaliation claim falters in two ways: she fails to allege that she told the SEC about violations of federal securities laws and that any protected activity caused her firing.  Taking each argument in turn, the Court finds that none carries the day.

### A.    Sovereign Immunity Does Not Bar Sampson's Claim

Governments, as sovereigns, generally cannot be sued without their consent.  The federal government possesses this immunity.  *See United States v. Navajo Nation*, 556 U.S. 287, 289 (2009).  So do the states under the Eleventh Amendment, which "confirms" the "presupposition" that each state—as "a sovereign entity"—is not "amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (citation omitted).  And though not a state, "the District of Columbia holds sovereign immunity" too.  *Craig v. Not for Profit Hosp. Corp.*, 626 F. Supp. 3d 87, 98 (D.D.C. 2022).  Its immunity from suit, however, is different from that conferred by the Eleventh Amendment, insofar as it extends only to "discretionary" acts; the District remains "subject to liability" for those "ministerial in character." *Rieser v. District of Columbia*, 563 F.2d 462, 475 (D.C. Cir. 1977), *vacated but reinstated in relevant part by* 580 F.2d 647, 649 (D.C. Cir. 1978).

Sampson and the Board clash over whether the Board shares the District's immunity, whether the D.C. Code waived any immunity, and whether the immunity even extends to the challenged conduct.  But the answer to the last question makes deciding the first two unnecessary.  Even if the Board wields the District's (non-waived) sovereign immunity, that immunity does not

preclude Sampson's suit.  The only claim she brings plausibly alleges that the Board engaged in a *non*-discretionary act by breaching a federal statute's prohibition on retaliating against whistle-blowers, so immunity tethered to discretion does not apply.  And that is no surprise: "[p]otential liability for" alleged violations of federal law like this one "will not deter" the Board "from performing" its duties, "but rather will encourage" it to perform them "conscientious[ly]"—by, among other things, not unlawfully retaliating against employees.  *Rieser*, 563 F.2d at 475.

As mentioned, any immunity that the Board possesses "depend[s] on the ministerial-discretionary dichotomy."  *Cherry v. District of Columbia*, 330 F. Supp. 3d 216, 228 (D.D.C. 2018).  A discretionary act is one "requir[ing] personal deliberation, decision, and judgment."  *Thurman v. District of Columbia*, 282 A.3d 564, 574 (D.C. 2022).  Discretion, after all, implies "room for policy judgment and decision."  *Id.*  But an act is not discretionary—and is thus the ministerial type that immunity does not extend to—if it calls for "little or no judgment."  *Craig*, 626 F. Supp. 3d at 100 (citation omitted).

Because the "discretionary-ministerial test" for the District's immunity and for the discretionary-function exception of the Federal Tort Claims Act "are similar," caselaw addressing the latter is a helpful guide.  *Cherry*, 330 F. Supp. 3d at 231 n.9.  That alignment makes sense because immunity premised on discretionary acts appears to protect similar interests in both contexts: "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *Loumiet v. United States*, 828 F.3d 935, 941 (D.C. Cir. 2016) (describing "purpose" of discretionary-function exception under FTCA); *accord Nealon v. District of Columbia*, 669 A.2d 685, 690 (D.C. 1995) (describing District's immunity for acts having "a broad public effect and call[ing] for a delicate balancing of competing considerations" (internal quotation marks and citation omitted)); *Spencer v. Gen. Hosp.*

*of D.C.*, 425 F.2d 479, 481 (D.C. Cir. 1969) (explaining that "municipal immunity in tort . . . deriv[es] from a purpose not to jeopardize 'the quality and efficiency of government itself' by exposing the exercise of discretion in the formulation of governmental policy to . . . tort liability" (citation omitted)).

When a "federal statute . . . specifically prescribes a course of action for governmental actors to follow," those actors lack discretion to deviate from that required path. *Craig*, 626 F. Supp. 3d at 100. The "element of discretion" underlying discretion-based immunity "is necessarily absent" in this context because a governmental entity cannot invoke judgment or discretion to breach "a specific mandatory directive." *Loumiet*, 828 F.3d at 941–42 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 545 (1988)). For example, if federal law required the Board to disclose certain information to the beneficiaries of the pension fund, the Board could not violate that obligation and then claim that it had discretion—and thus immunity—to act that way.

Nothing changes when the discretion-stripping law or policy is framed in the negative. Otherwise, the immunity question would turn on semantics. That is why the D.C. Circuit saw "no difference between a *prescription* by policy that leaves no room for choice and a *proscription* that does the same" when assessing whether conduct was discretionary for purposes of official immunity. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1143 (D.C. Cir. 2015) (rejecting rationale that policies did not remove "discretion for purposes of immunity" where the policies "describe[d] how *not* to act") (citation omitted)). Whether "phrased as prohibitions" on specific conduct or "as affirmative duties," a statute that eliminates discretion is just that—a binding limitation on the range of permissible conduct. *Id.* So if a municipal policy tells employees "*not* to engage in threatening and violent behavior in the workplace," a claim that "turn[s] upon a failure to act in accordance with" that policy is not subject to the similar sovereign-immunity bar applicable to the

Washington Metropolitan Area Transit Authority ("WMATA"). *Workagegnehu v. WMATA*, 373 F. Supp. 3d 110, 117–18 (D.D.C. 2019) (emphasis added). Such a prohibition leaves only one "rightful" (and non-discretionary) "option": "adhere to the directive." *Id.* at 117.

Against this backdrop, Sampson plausibly alleges that the Board acted beyond the scope of any discretion it had when it fired her after she spoke with the SEC. Federal law cabins employers' discretion by prohibiting them from "discharg[ing]" or otherwise "discriminat[ing]" against" a "whistleblower" who provides information about violations of federal securities laws. 15 U.S.C. § 78u-6(h)(1)(A)(i). Just as a defendant claiming discretionary-act immunity has "no discretion at all to engage in sexual harassment"—a point apparently acknowledged by the Board—such a defendant also lacks discretion to fire (and thus immunity for firing) an employee in a way that violates the sort of statutory anti-retaliation protections at issue here. *Turner v. WMATA*, No. 09-cv-812 (JEB), 2011 WL 13266591, at *10 (D.D.C. Nov. 21, 2011); ECF No. 9 at 18.

Two decisions from this District have held as much with respect to anti-retaliation protections. In *Craig v. Not for Profit Hospital Corporation*, the court held that several "mandatory statutory directives"—including a D.C. law "prohibiting" the defendant "from taking adverse personnel actions because an employee has engaged in certain protected activities"—meant that the defendant lacked "discretionary immunity" for claims "premised on" its "alleged violation[s]" of those statutory limits. 626 F. Supp. 3d at 100. And in another case, the court found no discretionary-act immunity for allegedly "terminating" an employee "in retaliation for" her "whistleblowing activities"—something that "[f]ederal law" and "WMATA's internal policy" barred. *Sichani v. WMATA*, No. 22-cv-1584 (CRC), 2023 WL 7279254, at *4 (D.D.C. Nov. 3, 2023). As explained more below, Sampson plausibly alleges that the Board violated Dodd-Frank's anti-retaliation

provision.  So any sovereign immunity that the Board possesses does not apply to this claim challenging non-discretionary conduct.

The Board counters with several unpersuasive arguments.  First, it insists that "employment decisions fall on the 'discretionary' side of the line."  ECF No. 9 at 18.  That is true generally, at least for tort claims against WMATA that challenge the "hiring, training, and supervision of [its] personnel." *Burkhart v. WMATA*, 112 F.3d 1207, 1217 (D.C. Cir. 1997).  Deciding how "budgetary constraints, public perception, economic conditions," and other factors affect those decisions creates room for "policy judgment," so claiming that WMATA "perform[ed]" its employee-supervision "functions" negligently runs headlong into WMATA's discretion.  *Id.*  How WMATA "reorganiz[es]" its procurement office, for example, "involve[s] a large measure of choice" and is thus a "discretionary activit[y]" immune from "tort claims."  *Beebe v. WMATA*, 129 F.3d 1283, 1288 (D.C. Cir. 1997).

But the discretion within the employment context is neither limitless nor helpful to the Board in this case, because Sampson *does* "point[] to" a "law" that "specifically prescrib[es]" what the Board could not do: retaliate against her for whistleblowing to the SEC.  *Burkhart*, 112 F.3d at 1217 (explaining that neither party identified a "law or policy" limiting WMATA's discretion).  So unlike WMATA in those cases, the Board was "told precisely" (by federal law, no less) that it could not do something but (allegedly) did that anyway.  *Beebe*, 129 F.3d at 1288.  This kind of alleged violation of a discrete statutory prohibition is what the D.C. Circuit had in mind when explaining that "not every action connected in some way to an employment decision amounts to a discretionary function."  *Id.*

Resisting this limitation on discretionary-act immunity, the Board insists that deciding "whether to retain an employee"—*i.e.*, whether to fire someone—"implicates precisely the

'complex balancing' of 'policy judgment[s]' that" triggers such immunity.  ECF No. 9 at 19.  Especially here, the Board contends, because Sampson was its "*general counsel*" rather than a rank-and-file employee.  *Id.* at 21.  But even a "decision[] . . . imbued with policy considerations" is not "discretionary[]" if it *also* "exceeds" the "bounds" of federal law, whether "constitutional" or statutory.  *Loumiet*, 828 F.3d at 944.  Sure, "[n]o statute . . . dictated whether" the Board had to "retain Sampson in light of her performance" and the Board's "needs."  ECF No. 9 at 19.  But Sampson alleges that the Board fired her for other reasons—ones that, if proven, violate a limitation that federal law places on employers' discretion.  In this way, she alleges that the Board acted not "within [its] discretionary authority" to make policy judgments, but outside the scope of that authority as defined by Dodd-Frank's anti-retaliation provision.  *Turner*, 2011 WL 13266591, at *10.  And the Board does not somehow obtain discretion to violate that prohibition just because Sampson's job was important.

Second, the Board contends that Sampson "cannot plead around [its] sovereign immunity" by "alleging that" firing her "was unlawful under Dodd-Frank."  ECF No. 9 at 20. In the Board's telling, "sovereign immunity" would "be useless" if it "fell away whenever a plaintiff claimed that the government's discretionary decision was unlawful."  ECF No. 12 at 13–14.  That argument has some surface-level appeal but comes up short because it misstates the relevant analytical framework.

Discretionary-act immunity does not fall away whenever a plaintiff claims that the government's discretionary decision was unlawful.  Stated in this way, that Board's concern assumes the conclusion.  But discretionary-act immunity turns on whether the challenged conduct was within the government's zone of discretion, so only a plausible claim that a law cabined that discretion *and* that the conduct fell outside that zone is beyond the scope of immunity.  In other words, a

decision is discretionary only if a law—or a binding regulation or policy—does not place it outside the bounds of permissible options. *See Workagegnehu*, 373 F. Supp. 3d at 117–18. Or framed inversely: if federal law "leaves no room for choice" by, for example, prohibiting employers from firing employees for protected activity, then an employer's decision to breach that limit is not discretionary. *Banneker Ventures*, 798 F.3d at 1143; *cf. Loumiet*, 828 F.3d at 944 ("The government 'has no "discretion" to violate the Federal Constitution; its dictates are absolute and imperative.'" (quoting *Owen v. City of Independence, Mo.*, 445 U.S. 622, 649 (1980)).

Thus, any immunity that the Board possesses turns on whether its action was "discretionary"—*i.e.*, on whether a "statute . . . specifically prescribe[d] a course of action" that it had to heed. *Beebe*, 129 F.3d at 1287 (citation omitted). This inquiry eschews absolutes. On the one hand, "not every action connected" to "an employment decision" triggers this limited immunity. *Id.* at 1288. But on the other, not every statutory or otherwise binding directive strips discretionary-act immunity; some might provide "room for the exercise of discretion." *Felder v. WMATA*, 105 F. Supp. 3d 52, 57 (D.D.C. 2015). A police unit's policy, for instance, could give officers "discretion[]" to "omit [a] warning" before deploying canines in certain "exigent circumstances." *Thurman*, 282 A.3d at 574–75. As the cases described above reflect, this issue is nothing new; courts have long had to decide which allegations of unlawful conduct are covered by discretionary-act immunity and which are not. And such immunity hardly seems useless to the District of Columbia, even if the Board might prefer an immunity that shields it from *any* lawsuit related to employment. In the end, the Board has not explained how Dodd-Frank leaves room for discretion in its anti-retaliation provision. Simply put, if Sampson plausibly alleges that she was fired because of her whistleblower disclosures, her allegations do not implicate a discretionary decision by the Board, at least at this stage.

14

Third and relatedly, the Board contends that *Oviedo v. WMATA* forecloses the idea that alleging a violation of federal law renders discretionary-act immunity inapplicable. *See, e.g.*, ECF No. 12 at 13. There, the D.C. Circuit addressed whether WMATA's "*Eleventh Amendment* immunity" derived from its "State signatories" shielded it from liability under the Age Discrimination in Employment Act. 948 F.3d 386, 393 (D.C. Cir. 2020) (emphasis added). The pro se appellant appeared to argue that "WMATA *waived* its immunity" by discriminating against him in "promotion and demotion decisions." *Id.* (emphasis added). Rejecting that argument, the panel held "WMATA is immune from ADEA liability" under binding precedent. *Id.*

*Oviedo* does not dictate the outcome here. To begin, the *Oviedo* court was construing the states' immunity under the Eleventh Amendment, which the District does not possess and which the Board disclaims as an immunity source. *See* ECF No. 12 at 7. Instead, as discussed, the District wields a more limited immunity that applies only "if the act complained of was committed in the exercise of a discretionary function." *Craig*, 626 F. Supp. 3d at 100 (quoting *Wade v. District of Columbia*, 310 A.2d 857, 860 (D.C. 1973)). Tracking that inquiry, the question here is whether the District's cabined immunity—assuming the Board possesses it—even covers the conduct underlying Sampson's suit. And that question is not the same as the one presented in *Oviedo*: did Congress, by creating WMATA as an entity imbued with Eleventh Amendment immunity, waive that immunity for ADEA claims? *See* 948 F.3d at 393. True, because the WMATA Compact waives some of that immunity, the inquiries for the District's and WMATA's immunity share a focus on discretion. But *Oviedo* does not answer the exact question at issue here, given these differences in posture and the court's lack of developed analysis on the discretionary-ministerial question.

Another reason *Oviedo* does not compel a different outcome is that the Board's broad reading of it would create significant tension with other D.C. Circuit and even Supreme Court precedent. The Board understands *Oviedo* to mean that a plaintiff cannot "convert a fundamentally discretionary decision into a ministerial one" by "accus[ing]" the "government" of "exercis[ing] its discretion" unlawfully. ECF No. 12 at 13. If it suggests that *Oviedo* holds that a decision can be discretionary even when a plaintiff alleges that the conduct violated a specific, applicable statutory directive about how the decisionmaker needed to act (or not act), such an interpretation would place *Oviedo* on a collision course with all the settled precedent discussed above. To repeat, that precedent explains that discretionary-act immunity "does not bar suits based on" the "failure to follow" a "statute, regulation, or policy" that "specifically prescribes a course of action"— whether "phrased as" a "prohibition[]" or as an "affirmative dut[y]." *Banneker Ventures*, 798 F.3d at 1138, 1143. In other words, as the D.C. Circuit has explained, "conduct that violates the mandates of a statute, rule, or policy" is not discretionary, so immunity tied to discretion does not protect such conduct. *Loumiet*, 828 F.3d at 944.[1]

The core principle underlying *Loumiet*—that "the element of discretion is necessarily absent where 'a federal statute . . . specifically prescribes a course of action'"—comes from the Supreme Court. 828 F.3d at 941 (quoting *Berkovitz*, 486 U.S. at 536). Indeed, *Berkovitz* recognized the intuitive idea that when a statute tells someone what to do, that person "has no rightful option but to adhere to the directive"—*i.e.*, has "no discretion." 486 U.S. at 536. Courts in this District have heeded that instruction, *see Craig*, 626 F. Supp. 3d at 100–01, finding that even "internal

---

[1] When assessing the District's limited immunity, cases like *Loumiet* discussing the Federal Tort Claims Act's discretionary-function exception are at least as relevant as cases addressing WMATA's immunity. After all, that "discretionary function jurisprudence" under the FTCA informs "whether a WMATA activity is discretionary." *KiSKA Constr. Corp. v. WMATA*, 321 F.3d 1151, 1159 (D.C. Cir. 2003) (internal quotation marks and citation omitted).

policies" prohibiting certain conduct can strip discretion and the "shield[]" of "sovereign immun-ity," *Workagegnehu*, 373 F. Supp. 3d at 117–18.  So if *Oviedo* meant to unsettle this central aspect of discretionary-act immunity by holding that conduct allegedly violating statutorily imposed lim-itations *can* be discretionary, the Court expects that the Circuit would have said so clearly.

The other decisions that the Board relies on are unavailing too.  *See* ECF No. 12 at 13; ECF No. 9 at 20.  In *Tapp v. WMATA*, the plaintiff did "not point[] to any regulation or . . . procedure that restrict[ed] WMATA's authority," and the court saw no other "binding limitation."  306 F. Supp. 3d 383, 397 (D.D.C. 2016).  Unsurprisingly, then, WMATA's decision—unbound by any restriction like Dodd-Frank's anti-retaliation provision—was discretionary.  *See id.*  The second cited case did not explicitly say that no such limit on discretion applied.  *See Chester v. WMATA*, 335 F. Supp. 2d 57, 61–62 (D.D.C. 2004).  But the claim there sounded in "tort" rather than a statutory directive, and the court never mentioned any specific mandate telling the defendant to do or not do something when managing employees.  *See id.*  And the third case resembles *Oviedo*—both in its analysis and (lack of) helpfulness to the Board—because it said only that "the ADEA did not *abrogate* the states'" or WMATA's "sovereign immunity."  *Taylor v. WMATA*, 109 F. Supp. 2d 11, 13–14 (D.D.C. 2000) (emphasis added).

At bottom, as the Board agrees, any immunity it possesses extends only to actions it takes within a discretionary zone of permissible choices.  One feature of federal statutes is that they define the boundaries of that zone.  So a claim plausibly alleging that the Board transgressed its discretionary zone also plausibly alleges a claim not covered by discretionary-act immunity.[2]

---

[2] Neither party addresses exactly *what* a plaintiff needs to allege about the unlawful conduct to clear the sovereign-immunity bar when the immunity turns on whether the conduct was discre-tionary.  Some cases suggest that the bar is lower than that for stating a claim, instead requiring only that the claim be "premised on" the defendant's "alleged violation of" a "mandatory statutory

**B.      Sampson Has Plausibly Alleged that the Board Unlawfully Retaliated Against Her for Protected Activity**

The Board also contends that Sampson has not stated a claim under Dodd-Frank for whistleblower retaliation.  That statute protects and rewards "whistleblowers," defined as individuals who provide "information relating to a violation of the securities laws to the" SEC "in a manner established" by the Commission.  15 U.S.C. § 78u-6(a)(6).  It does so in three ways: by guaranteeing their confidentiality, *id.* § 78u-6(h)(2); shielding them from retaliation, *id.* § 78u-6(h)(1); and offering financial rewards if the information leads to a successful enforcement action, *id.* § 78u-6(b).  The second benefit is the most relevant here.  If a whistleblower "alleges discharge or other discrimination" violating the anti-retaliation provision, she "may bring an action" under Dodd-Frank for several kinds of relief.  *Id.* § 78u-6(h)(1)(B).  This statutory structure means that a plaintiff alleging unlawful retaliation must plead that she "engaged in a protected activity"—*i.e.*, that she was a whistleblower; that she "suffered an adverse employment action"; and that this action "was causally connected to the protected activity."  *Rimini v. J.P. Morgan Chase & Co.*, No. 22-cv-7768 (JPC), 2024 WL 4354875, at *7 (S.D.N.Y. Sept. 30, 2024) (citation omitted).

Sampson alleges that the Board fired her, *see* Compl. ¶¶ 84–89, so sensibly it does not challenge the adverse-action requirement.  Instead, the Board insists that Sampson "fails to identify" how "her contact with the SEC related to the violation of any securities laws."  ECF No. 9 at 23.  She falls short on causation too, the Board contends, because documents that she mentions in

---

directive[]."  *Craig*, 626 F. Supp. 3d at 100; *see also Turner*, 2011 WL 13266591, at *10 (discretionary-act immunity inapplicable to "claim that does not *focus on* decisions made" within "discretionary authority" (emphasis added)).  Others seem to ask whether "the plaintiff has plausibly alleged" that the conduct "violates" federal law or another binding limitation.  *Woodruff v. United States*, No. 16-cv-1884 (RDM), 2020 WL 3297233, at *7 (D.D.C. June 18, 2020).  But the Court need not delineate the standard here.  Sampson plausibly alleges that the Board violated federal law's limitation on its discretion, and no party argues for a higher standard than that one.

her complaint show that was not fired for telling the SEC about potential legal violations. *See id.* at 26–30. Rather, they reveal that the Board fired her "for failing to disclose to" it the "misconduct by investment managers." *Id.* at 27. But both arguments demand too much of the complaint at this stage. Sampson needed to "allege[] all the facts needed to state" a claim, *Mohamed v. Select Portfolio Serv., Inc.*, 215 F. Supp. 3d 85, 99 (D.D.C. 2016), not detailed theories of causation and liability under the securities laws. Because the Board faults her for not including the latter, its arguments fall flat.

### 1.    Protected Activity

Begin with Sampson's whistleblower status—the key to unlocking Dodd-Frank's protections. Sampson alleges that she provided information to the SEC, both by phone and through a secure online portal. *See* Compl. ¶¶ 53, 58–70. That checks almost all the boxes under Dodd-Frank's whistleblower definition. The remaining part—and the part that the Board challenges—requires that the information she provided "relat[e] to a violation of the securities laws." 15 U.S.C. § 78u-6(a)(6).

Congress's linguistic choice signals a wide scope. The "ordinary meaning" of "relating to," after all, "is a broad one": "to have bearing or concern," for example, or "to pertain." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)). So a person need not match citations to the U.S. Code with specific facts when providing information to the SEC; all the statute requires is "pertinent information." *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161 (2018). Following this natural understanding of the statutory language, SEC regulations explain that a person is "a whistleblower" if she, among other things, provides information "that relates to a possible violation of the federal securities laws . . . that has occurred, is ongoing, or is about to occur." 17 C.F.R. § 240.21F-2(a)(1); *see also id.* § 240.21F-

2(d)(1)(ii) (qualifying "for the retaliation protections" requires that a person "reasonably believe that the information . . . relates to a possible violation of the federal securities laws").

Sampson allegedly did just that. She says that she "provided information to the SEC Enforcement Division attorney relating to possible violations of the federal securities laws" by "Meketa and/or Artemis." Compl. ¶ 59. And in targeting this allegation as conclusory, the Board misses (or ignores) all the others supporting the inference that she gave the SEC qualifying information. For example, Sampson alleges that she told the SEC about the "text message" from Artemis's CEO that quoted discussions from a Board meeting attended only by Board representatives and Meketa. Compl. ¶¶ 31–32, 60. More than that, Sampson also conveyed "her belief," based on this text, that Meketa had "leak[ed]" the Board's "proprietary and confidential information about internal . . . investment deliberations" to an "investment management company" seeking Board "approval to invest a substantial amount of [Board] assets." *Id.* ¶ 60.

Placed in the unenviable position of contending that an investment adviser leaking confidential client communications to a potential investment manager does not count as information "relating to" a violation of securities laws, the Board comes up empty. It faults Sampson for not saying *how* this information relates to such a violation. ECF No. 9 at 25. But she did not need to package the alleged facts supporting relief within a "a precise legal theory" for how the text-message incident supports liability under the securities laws. *Mohamed*, 215 F. Supp. 3d at 99 (quoting *Skinner v. Switzer*, 562 U.S. 521, 530 (2011)). Rather, Sampson just had to allege facts supporting the inference that she shared with the SEC information connected to relevant legal violations. And she does so by saying that she told the SEC about the text-message issue and her concerns. That reporting implicates at least one federal law referenced in the complaint requiring "investment adviser[s]" like Meketa to "establish, maintain, and enforce written policies and procedures

reasonably designed" to "prevent misuses" of "nonpublic information."  15 U.S.C. § 80b-4a; *see also id.* § 78c(a)(47) (defining "the term 'securities laws'" to cover, among other laws, "the Investment Advisers Act of 1940"); Compl. ¶ 21 (alleging that § 80b-4a imposes obligations on Meketa).  Because the text-message incident suggests that Meketa either lacked or failed to enforce such policies and procedures, telling the SEC about it qualifies as information relating to a violation of the securities laws.  That holds true even though the Board criticizes how Sampson organized her complaint.  She did not need to "plead law or match facts to every element of a legal theory," *Philogene v. District of Columbia*, 864 F. Supp. 2d 127, 131 (D.D.C. 2012), so it does not matter that she discussed "various securities laws in one section" while describing what she "reported to the SEC" in another, ECF No. 12 at 16; *see also id.* at 5.

Other allegations confirm that Sampson has pleaded whistleblower status.  She told the SEC about the compliance questionnaire and the presentation reflecting "compliance concerns with Meketa," and the alleged facts support the inference that those concerns related to potential violations of the securities laws.  Compl. ¶ 62.  The SEC apparently thought so too: after Sampson relayed this information, an "Enforcement Division attorney" allegedly "requested" that she "provide" the "power point presentation" given to the Board's trustees.  *Id.* ¶ 63.  Had Sampson not given information relating to relevant legal violations in her initial call, it is unclear why the SEC would have asked for these materials.  And if the information provided did not relate to breaches of the securities laws, presumably the SEC would not have purportedly asked questions about the presentation in *another* call after receiving the materials.  But Sampson says that it did, and she and Woods gave "additional information about Meketa providing misleading information to the Trustees" and incapably "manag[ing] conflicts of interest."  *Id.* ¶¶ 68–69.  If that sounds like alleged conduct that the SEC might care about, it is.  *See* 15 U.S.C. § 80b-6 (making it "unlawful

for any investment adviser" to "defraud" or deceive "any client").[3]  These allegations bolster the conclusion that the complaint clears the bar on this score.

For all these reasons, Sampson has plausibly alleged that she provided the SEC with "information relating to a violation of the securities laws."  15 U.S.C. § 78u-6(a)(6).

### 2.    Causal Connection

Last up is causation.  Dodd-Frank prohibits "discharg[ing]" or otherwise "discriminat[ing]" against" a whistleblower "*because of* any lawful act" the whistleblower takes "in providing information to the [SEC]" under the statute.  15 U.S.C. § 78u-6(h)(1)(A)(i) (emphasis added).  Sampson meets this bar, and the Board's arguments to the contrary are unavailing at this early stage of the litigation.

Sampson's allegations about how the Board reacted before and after she spoke to the SEC support "a plausible inference" that it acted adversely against her because she engaged in protected whistleblowing activity.  *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025).  To start, she alleges the "why" for the Board's action.  Recall that she purportedly knew that the Board's "Trustees were sensitive to any critical information about" Meketa.  Compl. ¶ 41.  So did the Board's executive director, who "indicated" to Sampson that some trustees "would likely not

---

[3] The Board also cites a trio of cases far afield from this one, but none patches up the flaws in its argument.  In *Zillges v. Kenney Bank & Trust*, the plaintiff "observed"–and "reported"— "conduct that violated federal *banking* laws," not federal securities laws.  24 F. Supp. 3d 795, 797, 801 (E.D. Wis. 2014) (emphasis added).  *Hansen v. Musk* is an even more extreme—and thus even less helpful—example because it involved information about "thefts and drug cartel activity."  653 F. Supp. 3d 832, 838 (D. Nev. 2023).  And the reported information in the last case was about a "non-stock, not-for-profit corporation organized under" state law allegedly mishandling funds from a "private trust," so this information "hardly seem[ed] to implicate the federal securities laws."  *Fitzpatrick v. Milwaukee Sch. of Eng'g*, No. 18-cv-0541 (BHL), 2020 WL 7060133, at *2, 7 (E.D. Wis. Dec. 2, 2020).  Together, these cases support only the unremarkable and uncontested proposition that the information provided must relate to securities laws.  But they do not accomplish what the Board needs them to—that is, show that Sampson's information falls outside this category.

be receptive" to a presentation describing concerns about Meketa's compliance with the "requirements" of federal securities laws. *Id.* ¶¶ 40–41. That prediction allegedly proved correct; some trustees "showed little interest in Meketa's compliance issues and practices," even becoming "hostile" to Sampson and Woods for "rais[ing] them." *Id.* ¶ 46. And learning about those potential problems did not prevent the Board from renewing Meketa's contract at that same meeting. *See id.* These allegations plausibly support a causal theory: the Board wanted to protect Meketa and was motivated to retaliate against Sampson for reporting concerns about that firm to the SEC. Plus, the sequence leading to Sampson's termination adds support to that causal connection. About a week after Woods told the Board that she and Sampson had "contacted the SEC" with "information relating to a possible violation of federal securities law," the Board sent Sampson a letter explaining that it would "investigate" immediately. *Id.* ¶¶ 71–73. And "[p]ursuant to" that letter, she "was summarily put on administrative leave"—which itself may qualify as an adverse action. *Id.* ¶ 73; *see Stewart v. U.S. Dep't of Agric.*, No. 23-cv-1194 (TSC), 2024 WL 4332618, at *5 (D.D.C. Sept. 27, 2024). The Board then proposed removing Sampson about half a year after Woods revealed the SEC contact and fired her less than three months later. *See* Compl. ¶¶ 76–79, 84. So this seemingly uninterrupted trek towards termination, in light of the allegations supporting motive, further suggests that Sampson's protected activity caused an adverse action. *Cf. Allen v. Johnson*, 795 F.3d 34, 46 (D.C. Cir. 2015) ("evidence of a pattern of antagonism following closely on the heels of protected activity and related to the challenged employment action may establish the causation element").

The Board takes aim at a strawman to argue that these allegations are insufficient. Time and again, it insists that Sampson's "causation allegation" is "predicated *exclusively* on th[e] documents" that Sampson cited in her complaint to support the idea that the Board knew about her

protected activity before firing her.  ECF No. 9 at 26; *see also, e.g.*, *id.* at 29–30 ("Sampson relies exclusively on six documents to support her otherwise conclusory allegation of causation[.]"); ECF No. 12 at 18 (arguing that the Board "showed that Sampson predicated her allegations of causation exclusively on [the] documents").  And from that premise, the Board contends that the documents show that it fired her because she "fail[ed] to report the alleged misconduct to" the Board, eliminating any causal connection to her protected activity.  ECF No. 9 at 29.

The problem is that Sampson alleges facts supporting causation independent of those documents.  As described above, her allegations suggest that the Board's trustees and executive director did not want potential legal issues to interfere with its relationship with Meketa.  *See* Compl. ¶¶ 29–46.  Sampson also alleges that she and Woods told the Board about their communications with the SEC, that the Board immediately investigated her, and that it eventually fired her.  *See id.* ¶¶ 71–84.  To be sure, Sampson claims that several documents showed that the Board "confirmed its awareness" that she had given the SEC information.  *Id.* ¶ 75; *see also id.* ¶¶ 76–88.  But those allegations about the documents are not the only support for that aspect of the causal link.  *See, e.g.*, *id.* ¶ 71 (alleging that Woods told the Board about Sampson's SEC disclosures before the Board began investigating Sampson); *id.* ¶ 74 (alleging that Sampson "confirmed to a [Board] investigator that she had contacted the SEC and had provided it with information relating to a possible violation of federal securities law by [the Board's] registered investment advisers").  So even if the documents can be read to support the Board's theory—that Sampson was fired solely because she failed to report misconduct *to it*, rather than for reporting that misconduct to the SEC— the other allegations supporting causation remain untouched.

In any event, the documents do not undermine causation even on their own terms.  For starters, deciphering how those documents portray the role—if any—of Sampson's SEC reporting

in the Board's termination decision would be premature now. The final removal letter, for instance, seems to focus on how Sampson "failed to report to the" Board her "concerns." ECF No. 9-1 at 2. But the letter also mentions that Sampson "participated in a call" with the "Securities and Exchange Commission," *id.* at 2–3, and Sampson alleges that the Board was apathetic—and even hostile—toward negative information about Meketa *before* she did that. So the documents are not necessarily as uniform in how they depict events as the Board contends, especially given Sampson's other allegations. And although the Board insists that it is not asking the Court to jump the gun with "factfinding as to" its "reasons for terminating" Sampson, untangling the meaning of these documents would require just that. ECF No. 9 at 27.

Relatedly, even if the cited documents *did* unequivocally support the idea that the Board fired Sampson solely for not providing it with information, the Board's stated rationale is no trump card at the motion-to-dismiss stage. For one thing, the allegations plausibly suggest that this proffered explanation was pretextual. Sampson says that she expressed concern about Meketa to the Board's executive director and trustees but that nothing happened, raising questions about why the Board started caring about potential misconduct by its investment adviser *after* it learned that Sampson talked to the SEC. For another—and even more to the point—Sampson's allegations crossed the "threshold for a retaliation claim," so she did not need to "allege[] sufficient additional facts to rebut" the Board's "proffered non-retaliatory motivation for [her] termination." *Williams v. MediaLinks TV, LLC*, No. 22-cv-2427 (DLF), 2023 WL 2477978, at *4 (D.D.C. Mar. 13, 2023) (citation omitted); *see also, e.g.*, *Munro v. LaHood*, 839 F. Supp. 2d 354, 364 (D.D.C. 2012) (describing defendant's purported "nonretaliatory explanations for its actions" as "inapposite at the motion to dismiss stage").

Sampson has thus plausibly alleged that the Board fired her for engaging in protected activity, so she has stated a retaliation claim under Dodd-Frank.

**IV.    Conclusion and Order**

For all the above reasons, it is hereby **ORDERED** that Defendant's Motion to Dismiss, ECF No. 9, is **DENIED**.

       **SO ORDERED**.

/s/ Timothy J. Kelly        
TIMOTHY J. KELLY
United States District Judge

Date: August 29, 2025